In the Matter of Parental Rights of MLM, LFM and BDM.

MS, Appellant (Respondent),

v.

Robert KUCHERA, Director of the Department of Public Assistance and Social Services In and For CAMPBELL COUNTY, Appellee (Petitioner).

No. C-83-6.

Supreme Court of Wyoming.

May 25, 1984.

David A. Kinskey, Gillette, for appellant.

A.G. McClintock, Atty. Gen., Allen C. Johnson, Sr. Asst. Atty. Gen., Laura L. Beard, Asst. Atty. Gen., Cheyenne, Jack Sundquist, Deputy County Atty., and Francis E. Stevens, guardian ad litem, Gillette, for appellee.

Before ROONEY, C.J., and THOMAS, ROSE, BROWN and CARDINE, JJ.

BROWN, Justice.

Appellant appeals the trial court's termination of her parental rights to three daughters, MLM, LFM and BDM. The trial court's judgment followed a jury verdict which found that appellant had neglected her three children.

Appellant has raised the following issues on appeal:

"A. Did the trial court err in admitting evidence of a prior neglect adjudication?

"B. Did the trial court err in admitting evidence of 'abuse,' as defined by Wyoming law, where the natural parent was charged only with 'neglect,' as defined by Wyoming law?

"C. Did the trial court err in failing to instruct the jury that parental rights cannot be terminated on the basis of conditions that are the ordinary incidents of poverty?

"D. Did the trial court err in failing to instruct the jury that parental rights cannot be terminated on the basis that a young child, or the child's home, are unclean?

"E. Does the state bear the burden of making a reasonable, good faith and bona fide effort at rehabilitation?

"F. Did the plans for rehabilitation afford adequate notice to the defendant of what behavior was expected of her and the consequences of her failure to comply?

"G. Is there sufficient evidence to support the determination that the rehabilitative efforts of the authorized agency failed?"

Issues C and D will be considered together, and issues E, F, and G will be combined.

We will affirm.

Appellee, Campbell County Department of Public Assistance and Social Services (hereinafter D–PASS) first contacted appellant and her family in September 1981. Mrs. Greer Hastings, principal caseworker for D–PASS, was assigned to the case and made numerous home visits and telephone calls during a fifteen month period. Mrs. Hastings, in her position, was principally concerned with providing services to families that included neglected and abused children. Between September 1981 and December 1982 the three children were removed from appellant's home several times. Removal was either voluntary so that the children could be placed temporarily in foster care or was involuntary and the children were put in protective custody. After each removal the children were returned to appellant after her promise to correct certain deficiencies that were explained to her in detail. D–PASS workers and others found certain recurring problems and deficiencies with appellant and in her home: 1) inadequate heat, 2) hazards that endangered the children, 3) children were not receiving prescribed medicine, 4) bedwetting, lack of clean clothing, inadequate personal hygiene, 5) children's health problems, hunger and inappropriate behavior patterns, 6) physical mistreatment, and 7) generally, the children and the home were filthy and unkempt.

This is not merely a "dirty house" case; it is a case of three little girls living under conditions of squalor and neglect all their lives. D–PASS said, in effect, "enough is enough," and filed a petition for termination of parental rights.

The three girls were born in the State of Washington. MLM was born in 1974; LFM in 1976; and BDM in 1979. We do not have all the details of the conditions that existed in Washington, but generally, they were the same conditions as found in Wyoming.

We know in greater detail the circumstances of the children's welfare in Campbell County, Wyoming. Mrs. Hastings found three dogs and three cats in residence at appellant's home. On one visit she counted twenty piles of feces of various vintage in the hallways, bedroom and living room. Feces was detected on most home visits. The children and a dog drank out of the same water dipper; and the children found and ate remnants of food in junk cars on appellant's premises. Two of the children went to school hungry and begged for food; and they were given showers at school. They also went to school without warm clothes. They were given clothes from various sources, and these clothes ended up in soiled clothes piles in appellant's home. Besides incidents of wetting their pants at school, two children required some medical treatment at school, and were identified as having psychological problems. Additionally, appellant's home and her three girls were associated with a variety of strong odors, the smell of urine being predominate.

Caseworkers, nurses and others identified items and conditions in the home that they characterized as hazardous and dangerous to the health and safety of the children. One child was sleeping eighteen inches from a space heater with a pile of flammable material next to the heater. Food found in junk cars constituted a danger of bacteria and poison. Knives and medicine were accessible to the children. The caseworker noticed that there was no cover on the light switches or outlets, and exposed hot water pipes and aluminum siding with sharp edges also created a danger. These hazards were pointed out to appellant.

On December 7, 1982, appellee filed its petition to terminate the parental rights of appellant pursuant to § 14–2–309(a)(iii), W.S.1977, (Cum.Supp.1982).[1] This statute provides:

1. The petition also asks that the parental rights of the natural father be terminated under § 14–2–309(a)(i), W.S.1977. He did not answer

"(a) The parent-child legal relationship may be terminated if any one (1) or more of the following is established by clear and convincing evidence:

\* \* \* \* \* \*

"(iii) The child has been abused or neglected by the parent and efforts by an authorized agency or mental health professional have been unsuccessful in rehabilitating the family or the family has refused rehabilitative treatment, and it is shown that the child's health and safety would be seriously jeopardized by remaining with or returning to the parent."

Neglect is defined in § 14–3–202(a)(vii), W.S.1977:

" 'Neglect' means the failure or refusal by those responsible for the child's welfare to provide adequate care, maintenance, supervision, education or medical, surgical or any other care necessary for the child's well-being. \* \* \* "

We have previously considered the requirements of § 14–2–309(a)(iii), W.S.1977, and stated:

"Thus we examine the evidence to ascertain if it clearly and convincingly establishes the facts: (1) that CP has failed or refused to provide adequate care, maintenance, supervision, education or medical, surgical, or other care necessary for PP's well being; (2) that rehabilitative efforts by authorized agencies have been unsuccessful in correcting the situation; and (3) that PP's health and safety would be seriously jeopardized by remaining with or returning to CP. \* \* \* " *Matter of Parental Rights of PP*, Wyo., 648 P.2d 512, 513 (1982).

"Succinctly stated, parental rights cannot be terminated under § 14–2–309(a)(iii) unless there is the necessary quantum of proof to show 1) neglect, 2) a refusal or failure of rehabilitation, and 3) that the health and safety of the children will be in jeopardy if left with the offend-

the petition nor did he appear, and default was entered.

ing parent." *Matter of SKJ and SLJ,* Wyo., 673 P.2d 640, 644 (1983).

## I

Appellant contends that the admission into evidence of an adjudication of prior neglect in the State of Washington regarding appellant's children was erroneous, irrelevant and prejudicial. Appellant objected to three orders of the Juvenile Department of the Superior Court of the State of Washington in and for Cowlitz County, and two reports by the Department of Social and Health Services (hereinafter D–SHS). In determining the relevance of evidence objected to, certain rules and prior case law must be considered:

> "'Relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Rule 401, Wyoming Rules of Evidence.

> "All relevant evidence is admissible, except as otherwise provided by statute, by these rules, or by other rules prescribed by the Supreme Court. Evidence which is not relevant is not admissible." Rule 402, W.R.E.

> "Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Rule 403, W.R.E.

> "Any error, defect, irregularity or variance which does not affect substantial rights shall be disregarded." Rule 7.04, Wyoming Rules of Appellate Procedure.

Rule 61, Wyoming Rules of Civil Procedure, provides that an error in admitting evidence is not a ground for granting a new trial, for setting aside a verdict, or for disturbing a judgment tent with substantial justice" and an error must be disregarded which "does not affect the substantial rights of the parties."

A ruling of the trial court on the relevancy of evidence in termination of parental rights cases is "within its sound discretion and will be upheld absent the showing of a clear abuse of discretion." *Matter of Parental Rights of SCN and NAN,* Wyo., 659 P.2d 568, 521 (1983). The appellant has the burden to demonstrate an abuse of discretion in the court's ruling. *Nimmo v. State,* Wyo., 603 P.2d 386 (1979). Considerable deference is accorded an admissibility ruling of a district court on appellate review if a legitimate and rational basis exists for the decision. *Apodaca v. State,* Wyo., 627 P.2d 1023 (1981).

Courts generally hold that evidence of prior neglect of the same children is relevant in dependency or parental rights termination proceedings. *People v. D.A.K.,* 198 Colo. 11, 596 P.2d 747 (1979), appeal dismissed, 444 U.S. 987, 100 S.Ct. 515, 62 L.Ed.2d 416 (1979); *In Interest of Adkins,* Iowa, 298 N.W.2d 273 (1980); *In re Mosier,* 205 Neb. 340, 288 N.W.2d 22 (1980). The state must prove that less intrusive means of protecting a child have been attempted or are impractical before parental rights can be terminated. *Matter of Parental Rights of PP,* supra.

The showing of prejudice to exclude relevant evidence requires a demonstration that the "evidence had little or no probative value and that it was extremely inflammatory or introduced for the purpose of inflaming the jury." *Apodaca v. State,* supra, at 1027. Evidence must be deemed unfair to be prejudicial. *Grabill v. State,* Wyo., 621 P.2d 802 (1980). Questions regarding remoteness of evidence are within the discretion of the trial court and will not be upset unless an abuse of discretion exists. *Goodman v. State,* Wyo., 601 P.2d 178 (1979).

The evidence from the State of Washington proceedings tends to show a long history of neglect similar to the allegations of neglect charged in Wyoming. This evidence also tends to show that the condition that prompted appellee's action was not transitory but existed for more

than four years. The information from Washington shows the medical needs of the children and the care or lack of care provided by appellant. The records also show the rehabilitative efforts by the State of Washington and how appellant responded to these efforts.

The records from the Washington courts were relevant and properly received into evidence. Such evidence makes the existence of a fact that is of consequence to the termination of parental rights more probable than it would have been without the evidence, as required by Rule 401, W.R.E.

II

In appellant's second assignment of error she states that the petition for termination of parental rights charged neglect and that the more definite statement filed by appellee set out only instances or conditions of neglect. At trial, however, she states evidence of abuse was admitted. Appellant complains that to admit such evidence without notice was prejudicial and contrary to the mandates of due process. We do not agree.

■ Several months before trial appellant made a motion to require appellee to make a more definite statement regarding the nature of the neglect charge, the manner in which the children were in serious jeopardy and the nature of the rehabilitative efforts by appellee. Appellee responded to this motion by alleging, among other things, that appellant had failed to provide adequate care, maintenance, supervision, medical care and that rehabilitative efforts had been unsuccessful. Ordinarily, a petition need not specify every piece of evidence offered in support of the petition. *In Interest of F.H.*, N.D., 283 N.W.2d 202 (1979).

■ The evidence objected to by appellant was a bruise on LFM, step-father's abuse of the children and spanking the children for wetting the bed. We agree with the trial court that often there is a thin line between abuse and neglect. If a child is bruised it is important to know if the bruise got there because of some dangerous condition that a parent failed or refused to correct. If a step-father or another person abuses a child, it is evidence of neglect if a mother does not take some action to stop the abuse or remove the child from an abusive environment. *In re Tanya P.*, 120 Cal.App.3d 66, 174 Cal.Rptr. 533 (1981); *In re Lisa D*, 81 Cal.App.3d 192, 146 Cal.Rptr. 178 (1978); *In Interest of Castro*, 102 Idaho 218, 628 P.2d 1052 (1981).

Evidence was produced at trial that LFM and MLM had medical problems which may have caused the bed wetting. If a child has medical problems resulting in bed wetting, and inappropriate discipline is administered instead of indicated medical treatment, this would be evidence of neglect. However, spanking a child is not necessarily abusive and may very well be evidence that proper disciplinary measures are being taken to correct improper behavior.

We hold that admitting the evidence of a bruise, spanking and abuse by the step-father was not an abuse of discretion. Under the circumstances here the evidence objected to tended to show a pattern of neglect. An act or incident may be evidence of both neglect and abuse, and that was the situation here. In any event, the evidence objected to was only a minor part of the total evidence produced showing neglect. Appellant had adequate opportunity, through cross-examination and witnesses of her own, to explain or contradict this evidence.

III

Appellant assigns as error the failure of the court to give two instructions:

"The law guarantees to each individual the right to his or her children. Parental rights cannot be terminated on the basis that the natural parents, because of low social or economic standing, cannot provide their children with all the advantages that more affluent, better-educated foster parents could provide."

"The law requires that parental rights may not be terminated solely on the grounds of slovenliness in keeping a

young child clean or the childs [sic] home in good order. This is true even where such uncleanliness might offend you personally and even though it might be characterized by you personally as neglect. Parental rights can be terminated only under the circumstances that I have previously outlined to you."

These refused instructions encompass some of the language used in *DS and RS v. Department of Public Assistance and Social Services*, Wyo., 607 P.2d 911, 917 (1980):

" * * * It will not do for the State to fail to prove neglect but to argue that the natural parents, because of a low socioeconomic standing, cannot provide the child with all the advantages that more affluent, better-educated foster parents could provide. * * * "

" * * * [S]lovenliness in keeping a young child clean or his home in good order may offend many of us and may, by some, be characterized as neglect, but is not such neglect—assuming no serious health effect or risk—as will justify termination of parental rights." Id., at p. 919.

Appellant does not contend that the trial court did not adequately instruct the jury concerning what the state must prove to demonstrate neglect. She contends that the court must instruct the jury on conditions that do not constitute neglect.

The instructions offered by appellant and refused by the court instruct what not to consider. In a parental rights termination case there might be numerous things the jury should not consider. Focusing on a few would tend to confuse the jury or leave the impression that anything else could be considered. On the other hand, a complete list of things not to consider would be almost impossible to compile. When the court instructs the jury on what must be proved, it is implied that other matters are not to be considered. We believe the jury understands that. In *DS*, supra, we were not concerned with instructions nor failure to give instructions. In that case we set out standards and then reviewed the evidence to see if those standards had been met. The excerpts quoted from *DS* above were some of those standards.

In the ordinary parental rights termination case consideration is given to a combination of factors, incidents and conditions that demonstrate the neglect required to justify termination of rights. Rarely do we find a single condition or incident that standing alone would justify termination. Neglect is usually manifested by numerous incidents and conditions extending over a considerable length of time. We believe that a rule requiring the trial court to instruct the jury on conditions or incidents that should not be considered neglect would be impractical, confusing and inappropriate. The trial court is not obligated to give an instruction offered by a party as long as the jury is adequately instructed on the law as it pertains to that case. *Scheikofsky v. State*, Wyo., 636 P.2d 1107 (1981).

The trial court instructed the jury in Instruction No. 4 what the state must prove, and that the proof must be by clear and convincing evidence that appellant neglected her children. This instruction comports with the requirements set out in *In Matter of Parental Rights of PP*, supra. Instruction No. 8 defined neglect in the language of § 14–3–202(a)(vii), W.S.1977. Nothing was said in this instruction about slovenliness being related to neglect.

The first instruction proffered by appellant is particularly inappropriate. The state did not try to show or argue that the children would be better off with more affluent and better educated foster parents. The instruction offered by appellant would tend to negative something that was never an issue and focus the jury's attention on a non-issue.

We hold that the jury was properly instructed and that the two instructions proffered by appellant were properly refused.

IV

The final assignment of error relates to the rehabilitative efforts of an authorized agency. According to § 14–2–

309(a)(iii), W.S.1977, before parental rights can be terminated it must be shown, among other things, that " * * * efforts by an authorized agency or mental health professional have been unsuccessful in rehabilitating the family or the family has refused rehabilitative treatment. * * * "

Between November 1976 and September 1978 the State of Washington D–SHS received seven complaints concerning lack of proper care of appellant's two older children. The agency responded to these complaints and made a report to the juvenile court on September 14, 1978. The report reflected that the caseworker had found the complaints to be substantiated. The caseworker required that the children be taken to a doctor for medical attention, and suggested to appellant that she seek help from a teaching homemaker. The agency devised a plan to correct the deficiencies in the home and to improve appellant's parenting skills. The following agency services were offered:

"1. A teaching homemaker to help with organization of housework, child care, and nutrition;

"2. Availability of a caseworker for counseling, or referral to outside agencies, as needed;

"3. Parenting classes offered by the Child Protective Services social worker;

"4. Day care for LFM and MLM."

Appellant agreed to accept the services offered by the agency and to try to improve. After a time appellant and the natural father of the children refused to allow visits by anyone from the agency.

On October 27, 1978, a petition alleging neglect was presented to the Juvenile Department of the Superior Court of the State of Washington. LFM and MLM were declared by the court to be dependent children. The court found that appellant was deficient in parenting skills and standards of nutrition and sanitation necessary to maintain the children's health, that there was a manifest danger and that the children would suffer further neglect if they were not removed from the home. The

court awarded custody of LFM and MLM to D–SHS for placement in a foster home.

The Washington agency again reported to the court on March 28, 1979. The report showed some improvement since the September 14, 1978, report. The agency again set out goals and a plan to accomplish these goals. In a hearing before the court on April 3, 1979, the court found that the basic problems still existed to some extent. One of the children was returned to the physical custody of appellant. Under the supervision of D–SHS, appellant was ordered to continue with the plans set up by the agency.

Appellant's case was again before the Washington court on September 27, 1979, for review. The court found that neither parent had attended parenting classes as ordered. The order of the court that followed was substantially the same as the April order, and custody remained with D–SHS. In the court's order dated October 7, 1980, it was ordered that "dependency on LFM and MLM be dismissed." However, the order further stated that "This matter be reviewed on March 26, 1981, at 1:30 p.m." Appellant came to Wyoming in May 1981 and we do not know if her case was ever reviewed by the Washington court as ordered.

Beginning in September, 1981, employees of Campbell County D–PASS commenced visits and telephone calls to appellant's home. D–PASS and other agencies made innumerable contacts with appellant and her family in the next several months. Mrs. Hastings, the caseworker, made thirteen visits to appellant's home in a two-month period. The public health nurse made a total of nine visits to appellant's home in 15 months. The school nurse had contact with the two older girls almost daily during school. Mrs. Hastings discussed cleaning up appellant's house and warned her that the children would become sick if this were not done.

D–PASS also referred appellant to public assistance which included an energy program, a food stamp program, aid to dependent children program, emergency clos-

et for low-income families, and medical programs. She was also referred to low-income housing, mental health and public health nurse services, other health facilities, and was offered homemaker services and parenting classes. People's Project (a community project involving counseling and consulting) was made available. D–PASS set out in writing goals and plans to accomplish these goals. These plans were dated April 7, 1982, and August 24, 1982. Appellant's response to the written plans, counseling, advice and other help was generally to ignore them.

On a visit November 3, 1981, appellant refused to allow the caseworker to enter her home and did not respond to another offer to furnish homemaker services. On this visit the caseworker learned that the children were searching through junk cars on the premises, and were eating remnants of food they found in the cars. The caseworker warned of the hazards of eating this old food. Appellant's response was that she knew of the danger but the children liked to play in the old cars.

Frequently appellant would not let the caseworker or nurses in her home, or refused to open the door. Eventually appellant consented to homemaker services, and signed up for a parenting class. She only attended two out of six classes in a six-week period. Appellant cancelled numerous appointments or failed to show up, and she forgot about doctor's appointments. Every contact with appellant, in her home or at the D–PASS office, she was admonished to clean up the filth in her home and was cautioned about health and safety problems. Ultimately, appellant refused to work with any Campbell County agency.

Dr. Clare Haynes, a developmental psychologist, stated that the children had suffered severe neglect from birth. She was of the opinion that if the children were returned to their mother, "There may be irreversible damage because they have been neglected in terms of health hazards, nutrition, supervision and protection, stimulation opportunities for development in every level."

It is clear that the Washington D–SHS and the Washington court exerted considerable effort to rehabilitate appellant from 1976 to 1981. D–PASS and other Wyoming agencies made concerted efforts to rehabilitate appellant from September 1981 to December 1982. All the efforts of Washington and Wyoming failed, mainly because appellant refused to be rehabilitated.

Throughout appellant's brief she argues sufficiency of the evidence, even though this issue was not raised as such. She refers us to evidence favorable to her and excludes much of the unfavorable evidence. Appellant has ignored the standard of review, which is well-known:

"' * * * We will examine the evidence in the light most favorable to the appellee and will resolve all conflicts in evidence for the appellee. [Citation.] We will assume the evidence in favor of the successful party is true, leave out of consideration entirely evidence of the unsuccessful party in conflict therewith, and give to the evidence of the successful party every favorable inference which may fairly be drawn from it. [Citations.]'" *Matter of Parental Rights of PP*, supra, at p. 514.

Considering our standard of review we hold that appellee produced overwhelming evidence that the children of appellant had been neglected, that efforts by authorized agencies to rehabilitate appellant had been unsuccessful and that the children's health and safety would be seriously jeopardized by returning them to her.

 We recognize the fundamental right of parents to care for, educate, and associate with their children. A child has a fundamental right to live in an environment free from filth, health hazards and danger. A child has the right to be properly nourished and educated, and receive necessary medical attention. When the rights of a parent and the rights of a child are on a collision course, the rights of the parent must yield. The appropriate state agency need not wait for a catastrophic event to occur before it takes action.

The courts have carefully guarded the rights of parents. Our statutes and case law place a heavy burden on the state if parental rights are to be terminated. State agencies are not in business to ferret out parents who have deficiencies to the end that their children be taken away. To the contrary, state agencies are in business to protect and assist dependent children, and to rehabilitate parents who have deficient parenting skills. It is only in extreme cases that state agencies seek to terminate parental rights, such as appellee did in Campbell County. The jury was justified in returning a verdict that resulted in terminating appellant's parental rights.

Affirmed.