# IN THE SUPREME COURT, STATE OF WYOMING

## 2013 WY 43

APRIL TERM, A.D. 2013

*April 12, 2013*

IN THE INTEREST OF:  MC, HC and
CC, Minor Children,

DL,

Appellant
(Respondent),

v.                                                                              S-12-0199

STATE OF WYOMING,
DEPARTMENT OF FAMILY
SERVICES,

Appellee
(Petitioner).

*Appeal from the District Court of Hot Springs County*
*The Honorable Robert E. Skar, Judge*

*Representing Appellant:*
> Curtis Cheney of Messenger & Overfield, PC, Thermopolis, Wyoming

*Representing Appellee:*
> Gregory A. Phillips, Wyoming Attorney General; Robin Sessions Cooley, Deputy Attorney General; Jill E. Kucera, Senior Assistant Attorney General; Leda M. Pojman, Senior Assistant Attorney General.  Argument by Ms. Pojman.

*Representing Guardian Ad Litem:*
> Dan S. Wilde,  Permanency Attorney, Wyoming Guardian *Ad Litem* Program, Cheyenne, Wyoming; and Claudia Lair, Student Intern.  Argument by Ms. Lair.

*Before KITE, C.J., and HILL, BURKE, and DAVIS, JJ., and GOLDEN, J., Retired*

**NOTICE:  This opinion is subject to formal revision before publication in Pacific Reporter Third. Readers are requested to notify the Clerk of the Supreme Court, Supreme Court Building, Cheyenne, Wyoming 82002, of any typographical or other formal errors so that correction may be made before final publication in the permanent volume.**

**DAVIS**, Justice.

[¶1]    After an adjudicatory hearing in this abuse and neglect case, Appellant was found to have neglected her three children. She challenges that decision on the grounds she was denied fundamental due process rights because the trial court declined to grant a motion to dismiss or to strike witnesses after claimed discovery violations by the State, and because the evidence was insufficient to support a finding of neglect. We find that the trial judge did not abuse his discretion in dealing with the claimed discovery violations, that Appellant received due process, and that the evidence was sufficient to support a finding of neglect. We therefore affirm.

## ISSUES

[¶2]    1. Did the trial court abuse its discretion when it denied Appellant's motion to dismiss and to strike witnesses for claimed discovery violations that were not brought to the court's attention until the date of trial, and did its ruling on this issue result in a denial of due process?

2. Was there sufficient evidence to support the trial court's finding of neglect?

## FACTS

[¶3]    On January 27, 2012, the Hot Springs County Attorney's Office filed a petition alleging that Appellant DL's three children, MC, HC, and CC, were being neglected or abused, or both. At the time the petition was filed, MC was sixteen, HC was fifteen, and CC was twelve. All of the children resided with Appellant in Thermopolis.

[¶4]    The day before the petition was filed, school resource officer Deputy Cameron Simeral responded to a report that CC claimed to be "baked" at school, meaning that he claimed to be suffering from the effects of marijuana smoked the night before. Deputy Simeral learned from CC that his older brother MC had asked if he "wanted to get high" the previous evening. CC agreed, and both boys went to Appellant's bedroom and retrieved a glass pipe and a small bud of marijuana from a red tin they knew to be kept there. One or both of them then smoked the marijuana in the garage. MC was interviewed and reported that CC appeared to be "high" for the rest of the night. Based on this information, Deputy Simeral obtained and executed a search warrant on Appellant's house.

[¶5]    The search yielded the red tin described by CC, which contained a few small buds suspected to be marijuana, as well as a glass pipe, pipe cleaners, and lighters. The suspect substance tested presumptively positive for Tetrahydracannibinol (THC), the active ingredient in marijuana, and Appellant was therefore arrested and taken into custody for possession of a controlled substance in violation of Wyoming Statute § 35-7-

1

1031(c)(i)(A). The children were placed in temporary protective custody pending a shelter care hearing.

[¶6]    Appellant was released on bond to await trial on the pending possession charge. The district court sitting in juvenile session[1] held the shelter care hearing required by Wyoming Statute § 14-3-409 on January 27, 2012. At the hearing, the State, Appellant, and the children's guardian *ad litem* ("GAL") stipulated that the Appellant would clean up the home, that the children would be returned to her care, and that all would participate in further efforts to keep the home clean pending a hearing. Appellant also agreed to have no contact with children under the age of eighteen, except for family members.

[¶7]    The court found that shelter care was no longer necessary, and that the children's best interests would be served by returning them to Appellant's home under the conditions provided by the stipulation. The court required Appellant and her children to clean the home and to return it to a presentable condition as the parties and the GAL had agreed, and it also required Appellant to permit the Department of Family Services (DFS) to periodically inspect it. It also ordered Appellant to undergo random drug testing. The court scheduled an adjudicatory hearing at which the State would be required to prove its allegations of abuse or neglect for April 23, 2012.

[¶8]    Appellant's counsel filed a motion to dismiss on the day of the hearing. She alleged that the State had failed to comply with Rule 3 of the Wyoming Rules of Procedure for Juvenile Courts (W.R.P.J.C.), which governs discovery in all juvenile cases, including abuse and neglect, delinquency, and child in need of supervision proceedings. She contended that the State failed to timely provide exculpatory evidence consisting of a negative urinalysis (UA) conducted on CC. Appellant also claimed that the State failed to provide a witness list before the hearing, which violated W.R.P.J.C. 3(b)(3). Appellant moved the court to dismiss the petition, or in the alternative, to strike the State's witnesses. She claimed that her rights to due process had been violated.

[¶9]    The court heard arguments on the motion before the adjudicatory hearing began. Counsel did not call any witnesses or present any evidence, but instead argued their respective positions. Appellant's attorney indicated that she had sent the county attorney's office a letter concerning discovery on April 10, 2012, a little less than two weeks before the hearing. In it, she indicated that "[i]t is my understanding that [CC] provided a UA and I have no information regarding this [sic] of the results. Please provide this to me."

---

[1] For the benefit of out-of-state readers, Wyoming district court judges sit as juvenile court judges in the counties of their respective districts. Wyo. Stat. Ann. § 5-8-101 (LexisNexis 2011).

2

[¶10] The county attorney indicated that he initially received a report from DFS stating that no UA had been done. This was consistent with a police report indicating that no urine sample had been taken from CC. CC was asked to provide a sample on January 27 but was initially unable to do so. Apparently a sample was taken later in the day by an agency not specifically identified in the record.

[¶11] When the county attorney met with DFS employees to prepare them for the adjudication hearing on April 19, he learned that CC had in fact provided a urine sample which tested negative for controlled substances. He supplied the information to Appellant's counsel on April 20, the Friday before the adjudication hearing was to be held.[2] The county attorney also argued that Appellant was aware of the existence of the negative drug test before he was, and that although Appellant's counsel did not receive a witness list, the reports and other documents produced in discovery provided sufficient information for Appellant's counsel to identify witnesses and to determine the substance of their testimony. He had his own complaints about Appellant's failure to provide releases so that he could obtain information concerning MC's counseling.[3]

[¶12] The guardian *ad litem* aligned with the State, pointing out that Appellant's counsel should have filed a motion to compel under W.R.P.J.C. 3(f). He argued that "the rule to me is clear that if a respondent is not feeling that they are getting information, they need to file the motion." He did not believe the county attorney had intentionally withheld exculpatory or other evidence because he had continuously received updated information throughout the pendency of the abuse-neglect proceedings. Counsel for Appellant admitted that she could have filed a motion to compel, but that she did not do so because she "was trying to maintain civility."

[¶13] Counsel for the Appellant did not request a continuance to allow additional time to prepare for the adjudication hearing.[4] The court denied the motion to dismiss or strike

---

[2] The record is not completely clear, but it seems to indicate that Appellant's counsel was provided a copy of the written test report. It is clear that she knew the test was negative.

[3] The Court notes that its procedural rules do not contain any "tit for tat" provisions. Failure of one party to comply with discovery requirements or court orders does not automatically excuse the aggrieved party from its discovery obligations.

[4] Appellant's counsel concluded her argument on the motion to dismiss with this sentence:

> . . . . And therefore I would just ask that this State's Petition to adjudicate the children as abused and neglected be dismissed, and if not, then I would like to strike any witnesses or evidence that hasn't been produced to me so that my client can adequately prepare, and any other relief. . . .

The juvenile court did not interpret this as a request for a continuance, and neither do we.

3

witnesses "[b]ased on what [it] heard here today."  The adjudication hearing began immediately after this ruling.

[¶14]  The State called Deputy Simeral as its first witness.  He testified to the following:

> Q. . . . [C]ould you please describe the general condition that you observed while in the house?
>
> A. As mentioned earlier, just clutter, dirty clothes, food, empty packages of random food, cans of soda, foul smell. Upstairs there were more of the same to include personal papers and bills belonging to [Appellant], I assume, pill bottles scattered. There was dried bloodied bandages on the bathroom floor, is what it appeared to be, as well as other soiled napkins and things of that sort.
>
> Q. And did you in fact find any controlled substances at that house?
>
> A. Yes I did.
>
> Q. And what did you find?
>
> A. A small red tin located next to [Appellant's] bed with lighters, a glass pipe, and a smaller tin containing a few buds of marijuana.

[¶15]  Deputy Simeral also described MC's room as "very cold, very cool. No carpet. It was the basement, unfinished basement area. I don't recall any lighting system. If there was, it was a single bulb. It smelled foul, dirty, damp, a typical basement."  He believed the condition of the house posed a serious health risk, given the dried blood, the temperature of MC's room, and "the bathrooms being the way they smelled."

[¶16]  The State's next witness was Shari Rogers, a DFS juvenile probation officer. She testified that she went to the county jail on January 27 because Deputy Simeral asked her to help obtain a urine sample from Appellant.  Appellant was released on bond on the possession charge while Ms. Rogers was still at the jail, and Ms. Rogers gave her a ride because she did not have appropriate winter clothing for the walk home. Ms. Rogers encouraged Appellant to quit smoking marijuana, but Appellant replied that "well, that's

not going to happen." She added that if DFS broke her family up for that reason, that would just be what happened.[5]

[¶17] On cross-examination Ms. Rogers admitted that she had been visiting Appellant's home since 2004 because MC had previously been adjudicated delinquent, and that she had never reported a health risk. However, she testified on redirect examination that she believed that bloody cloth rags and rotten food would pose a health risk, at least to younger children.

[¶18] The State also called MC as a witness. He testified that Appellant smoked marijuana often, and that when she did she stayed in her room watching Netflix and playing computer games. MC testified that during those times their home "just reeks with marijuana," and that Appellant did not interact with the children. He also testified that her demeanor becomes "edgy, like she gets mad at things that are really trivial, I guess."

[¶19] MC further testified that Appellant kept her marijuana in a location accessible to him and his siblings:

> A. Yeah, that night [January 25] me and my little brother, we went upstairs and Mom had marijuana in the house, so we took her pipe and some of her marijuana, we went to the garage and he smoked it and I didn't, so . . .
>
> Q. Okay. Why did that occur?
>
> A. It was there and I guess we just had the idea, "Let's get high," so . . .
>
> Q. Okay. How did you know your mother had it up there?

---

[5]Appellant did not display an attitude of greater cooperation with the juvenile court. After she had been adjudicated to have neglected her children, she was ordered to undergo a psychological evaluation and to allow DFS access to her home so that it might be inspected. The court was clearly authorized to order the evaluation by Wyo. Stat. Ann. § 14-3-429(d)(ii) (LexisNexis 2011). To this oral order, Appellant responded "Your Honor, you can save yourself some steps because I am not going to do the psychological evaluation, and I'm not letting them [DFS] in my house anymore, so you can throw my ass in jail and I'll sit there. You still won't have it because I'm not going to do it." It is to the trial judge's credit that he did not immediately accept Appellant's invitation, but instead gave her time to reconsider that choice after consulting a newly appointed attorney who had replaced counsel who conducted the adjudication hearing. The author of the predisposition report indicated that Appellant refused to participate in compiling the report, forcing DFS to gather information it hoped to elicit from her solely from DFS records.

5

A. It's because she's always had it up there. There was a small red tin that sits on her computer tower that has been there about as far as I can remember, so . . .

Q. Do you know whether your brother and sister were aware that it was there?

A. I'm pretty sure they were. Actually, I know it was, because [CC] was the one that told me it was there, so . . .

[¶20] MC testified that the house was cluttered and "never clean." He stated that Appellant did not clean up cat and dog feces scattered throughout the house. He indicated that the food the family had was "sometimes rotting," because it was provided by a friend who salvaged it from dumpsters at nearby grocery stores. He also testified that water leaked into his room in the basement when anyone took a shower, and that his room was "extremely cold. There were times where I had frost inside the window and I could see my breath at night, just freezing." He indicated that Appellant would not use the home's central furnace because there were no filters for it, and that she refused to buy the required filters. Although there were one or two portable heaters, these were used by Appellant and MC's sister, HC.

[¶21] Annalise Rossler, a social worker with DFS, testified that she had been involved with this case since the beginning. She testified that Appellant provided approximately seven to ten urine samples, and that all but one of these samples tested positive for THC, including the most recent one. Under questioning by the State, she testified that a urinalysis was done on CC, and that it was negative.[6] Appellant's counsel established on cross-examination that the test was negative not only for THC, but also for a number of other controlled substances.

[¶22] Appellant also testified at the adjudication hearing. She indicated that although sixteen-year-old MC had been involved in delinquency proceedings in juvenile court since 2004, there had been no prior abuse or neglect proceedings regarding any of the children. She elaborated on the difficulties she has encountered with MC, including: (1) drug use; (2) insulting her in a profane way; (3) chasing her out of the family home with a butcher knife following his return from an out-of-home placement; and (4) threatening to kill her. She testified that the week of January 25 was "a pretty bad week," because she had a head cold, because she had attended an extended therapy session that week, and because she was menstruating at the time, thus explaining the bloody cloths.

---

[6] Neither party offered the report of test results as an exhibit, although counsel for the State and Appellant evidently had it based on their representations to the court when the motion to dismiss was heard.

[¶23]  Appellant denied having marijuana in the house on the night of January 25, and claimed that she doesn't smoke marijuana around her children.  She also claimed that she hadn't smoked marijuana in over sixty days, although she did not deny that she had a pipe for smoking marijuana.  She believed that her recent UAs were not clean because of "[r]esearch I've done on the internet, I'm heavy, I'm not active, I don't drink a lot of water."  She testified that she was trying to quit smoking marijuana by participating in a voluntary addiction recovery program at her church.

[¶24]  Appellant also testified that her house "is never really perfect."  She admitted that her dog "leaves tootsie rolls" occasionally, but maintained that she picks them up promptly.  She believed that the children were old enough to clean up the common areas of their home, but indicated that they did not do so.  She testified that there was radiant and forced air heat throughout the house contrary to what MC claimed, that there was no frost on the windows, and that it was never so cold in the house that one's breath could be seen.  She also indicated that a DFS caseworker had visited her home before, and that person did not believe that MC's room posed a health risk after inspecting it.

[¶25]  Cross-examination established that Appellant had been awarded $1,500 in monthly child support, although she did not always receive that amount. She did not work or attend school, although she did provide child day care at her home before her arrest.  She was no longer able to do so at the time of the hearing because one of her bond conditions prevented her from spending time with children other than her own.   She testified that she had attempted to find other jobs.

[¶26]  The trial court found as follows:

> First of all, the Court does find that the condition of the home is, as illustrated in State's Exhibits 1 through 4, that the Court finds that it is, if nothing else, a cluttered mess.  The Court does accept the testimony that there was rotting food and it was unsanitary for the kids at any age to be living within in [sic].  The Court will adjudicate that as an element of neglect in this case.
>
> The Court also finds that the use of marijuana has contributed and jeopardized the health and safety of [CC].  This is not a speeding case, ma'am, this is an example that you are making for your kids.  Whether you subscribe to the idea that marijuana is not an unhealthy thing, that's beside the point.  The point is your kids are now using.  Your 12-year-old shows up half baked at school.  As a result of that the Court finds that it has jeopardized your children's health and safety and welfare.  And you may say this is an effort to get

7

you off of using marijuana; that's true. It's to set an example for your kids.

Now I have no doubt that [MC]'s the most difficult kid that ever got raised, and we have been dealing with this for as many years as I've been on the bench here. That[,] however, doesn't excuse the example that you are setting for your kids. So I will adjudicate this as a neglect case and we'll set this matter down for a disposition hearing.

The Court later issued a written order finding that "the allegations of the Petition were true." After a predisposition report was compiled and a disposition hearing was held, the Court entered an order returning the children to Appellant's home subject to DFS oversight and other conditions.[7]

[¶27] The record on appeal indicates that Appellant was incarcerated for 119 days in October of 2012 for violating conditions of probation imposed as a result of a conviction on the drug possession charge. This required a change of placement, and the younger children lived with Appellant's adult sister after she was arrested. Both DFS and the Multi-Disciplinary Team (MDT) assembled for the case recommended that the younger children be placed in a permanent guardianship with their aunt, and that MC be placed in foster care pending transition to independent living when he turns eighteen in mid-2013. Appellant timely appealed the adjudication of neglect.

**STANDARD OF REVIEW**

[¶28] Appellant challenges the trial court's decisions regarding claimed discovery violations by the State. She asserts that the State's actions constituted an infringement of her due process rights and argues that this Court must review the record *de novo* to determine whether any of the rulings in question made the adjudication hearing fundamentally unfair. Our review of the trial court's resolution of the alleged discovery violations is governed by the following principles:

Rule 3(f) provides several options to the juvenile court once it learns that a party did not comply with its discovery obligations. In other contexts [both civil and criminal], we have stated that the trial court has discretion in determining the appropriate remedy or sanction for violation of discovery requirements. The language of Rule 3(f) clearly indicates that the juvenile court is likewise intended to have broad

---

[7] The order of disposition is not in the record, but the parties' briefs agree that two of the children were returned to the home. At some point, MC was placed outside the home on a delinquency matter.

discretion in crafting a remedy for a discovery violation. Accordingly, we conclude that the appropriate standard for reviewing the juvenile court's decision is the abuse of discretion standard.

*In re MM*, 2009 WY 28, ¶ 15, 202 P.3d 409, 414 (Wyo. 2009) (citations omitted). We will therefore review the district court's discovery decision first for an abuse of discretion.

[¶29] As to the due process argument related to the alleged discovery violations, the standard of review is as follows:

> The party claiming an infringement of his right to due process has the burden of demonstrating both that he has a protected interest and that such interest has been affected in an impermissible way. The question is whether there has been a denial of fundamental fairness.

*In re KMO*, 2012 WY 100, ¶ 30, 280 P.3d 1216, 1224 (Wyo. 2012) (quoting *In re "H" Children*, 2003 WY 155, ¶ 38, 79 P.3d 997, 1008 (Wyo. 2003)). The touchstones of due process are notice and the opportunity to be heard, which must be appropriate to the nature of the case. *"H" Children*, ¶ 39, 79 P.3d at 1008; *see also Frank v. Mangum*, 237 U.S. 309, 347, 35 S. Ct. 582, 595, 59 L. Ed. 969 (1915) ("Whatever disagreement there may be as to the scope of the phrase 'due process of law,' there can be no doubt that it embraces the fundamental conception of a fair trial, with opportunity to be heard.").

[¶30] As to the second issue, our review of the sufficiency of evidence to sustain a finding of neglect is governed by the following principles:

> 1. [We] [g]ive considerable deference to the trial court's determination because it has the advantage to judge the demeanor and intelligence of the witnesses;
>
> 2. [We] [e]xamine the evidence in the light most favorable to appellee and resolve all conflicts in evidence for appellee; [and]
>
> 3. [We] [a]ssume as true the evidence in appellee's favor, disregard entirely appellant's evidence in conflict with appellee's evidence, and give to appellee's evidence every favorable inference that may fairly be drawn.

*In re DRS*, 2011 WY 128, ¶ 31, 261 P.3d 697, 706 (Wyo. 2011) (quoting *In re HP*, 2004 WY 82, ¶ 17, 93 P.3d 982, 987 (Wyo. 2004)). The State was required to prove neglect by a preponderance of the evidence. Wyo. Stat. Ann. § 14-3-425(a) (LexisNexis 2011); *"H" Children*, ¶ 54, 79 P.3d at 1012–13 (citing *In re CP*, 965 P.2d 1155, 1157 (Wyo. 1998)).

## DISCUSSION

### *Motion to Dismiss and to Strike Witnesses*

[¶31]   Appellant contends that the trial court erred in finding that she had neglected her children.  She first claims that the State's failure to timely produce exculpatory evidence and a witness list violated the Wyoming Rules of Procedure for Juvenile Courts, and that as a consequence she did not receive a fair trial in violation of her rights to due process under the Wyoming and federal constitutions.  She argues that the trial court should have either dismissed the abuse-neglect petition or granted her motion to strike the State's witnesses.

[¶32]   Rule 3 of the Wyoming Rules of Procedure for Juvenile Courts provides for what is commonly called self-executing discovery similar to that available in civil actions.  The rule provides in pertinent part as follows:

> (b) *Discovery by the State.* The State shall without the necessity of a request by the Respondent or the guardian ad litem, and within thirty (30) days of service of the applicable petition, furnish to the Respondent and guardian ad litem:
>
> > (1) Any material or information within the knowledge, possession or control of the State which tends to negate the involvement of the Respondent as to the offense charged;
> >
> > .   .   .
> >
> > (3) The name and address of each person the State intends to call as a witness at any hearing to prove its case in chief or to rebut alibi testimony to the extent then known;
> >
> > .   .   .
>
> (c) *Compliance by the State.* The State may comply with this rule by advising the Respondent and the guardian ad litem in writing or on the record, that the Respondent and the guardian

10

ad litem may inspect the discoverable portions of the State's file and by allowing such inspection to occur at any time during normal business hours.  However, if the State has any exculpatory information specified in this Rule, the State shall promptly furnish such information to the Respondent and the guardian ad litem, whether or not the Respondent or the guardian ad litem has made the inspection provided for by that subsection.

.   .   .

(f) *Procedure for Discovery, Time.* The State shall make the disclosure required under this Rule, and may request reciprocal discovery within thirty (30) days from the service of the petition.  The Respondent and the guardian ad litem shall furnish the discovery required under this Rule within thirty (30) days after a request is made.  The court, for good cause shown, may extend the time for discovery. If discovery is not furnished as required, a motion to compel discovery may be filed which shall specify the items which have not been furnished.  A hearing shall be held no later than three (3) days after the motion is filed.  If, at any time during the proceedings, it is brought to the attention of the court that a party has failed to comply with this Rule or an order issued under this Rule, the court may:

> 1. Order such party to permit the discovery of the matters not previously disclosed;
>
> 2. Strike the testimony to which the undisclosed matter relates;
>
> 3. Grant a reasonable continuance;
>
> 4. Prohibit the party from introducing in evidence the matter not disclosed;
>
> 5. Grant a mistrial; or
>
> 6. Enter such other order as may be appropriate under the circumstances.

(g) *Continuing Duty to Disclose.* If, subsequent to compliance with a request made under this Rule or with any order compelling discovery, a party learns of additional information previously requested and required to be furnished, he shall promptly furnish the information to the other party or his counsel. If the additional information is learned during a hearing, he shall, in addition to furnishing the information promptly to the other party or his counsel, notify the court that such matter is being furnished.

.  .  .

(j) *Timely Disclosure Required.* All matters and information to which a party is entitled must be disclosed in time to permit its beneficial use.

W.R.P.J.C. 3(b), (c), (f) (g), (j).

[¶33] Rule 3(b)(1) unequivocally requires the State to provide the respondent to a neglect petition all information which tends to negate that person's involvement in the charged offense, *MM*, ¶ 12, 202 P.3d at 414, and Rule 3(b)(3) requires it to provide a list of witnesses. The witness list and notice of exculpatory information are to be served within thirty days of service of a juvenile petition. This is a fairly short time for the State to conduct an investigation and identify pertinent documents and witnesses in cases which are often filed on short notice because of emergencies requiring immediate action to protect a child. The volume of cases handled by county or district attorneys can also be daunting.

[¶34] However, in light of the fact that an adjudicatory hearing must be conducted within sixty to ninety days of the parent's initial appearance, the time limitation imposed by the rule is reasonable.[8] The Court is aware that as a practical matter disclosures must be and are routinely supplemented as additional information becomes available in these and other cases involving self-executing disclosure requirements. The rule accounts for the possibility of supplementation by providing that any information provided must be disclosed in time "to permit its beneficial use." W.R.P.J.C. 3(j). In addition, the rule permits the court to extend the time for completion of self-executing discovery for good cause. W.R.P.J.C. 3(f).

---

[8] If the allegations of a petition alleging abuse or neglect are denied, the court is required to set an adjudicatory hearing within sixty days. That period may be extended no more than an additional thirty days, for a total of ninety days, for good cause shown. Wyo. Stat. Ann. § 14-3-426(b) (LexisNexis 2011).

[¶35] Rule 3(f) also allows the parties to file a motion to compel if "discovery is not furnished as required." W.R.P.J.C. 3(f). It requires the court to hold a hearing on the motion within three days, *id.*, and "provides several options to the juvenile court once it learns that a party did not comply with its discovery obligations." *MM*, ¶ 15, 202 P.3d at 414. "The language of Rule 3(f) clearly indicates that the juvenile court is . . . intended to have broad discretion in crafting a remedy for a discovery violation," and we review the juvenile court's decision for an abuse of discretion. *Id.*

[¶36] The State did not supply a witness list or the negative urinalysis performed on CC. We can discern no valid reason that a witness list was never provided. It might have been possible for Appellant's counsel to divine the identity and probable testimony of potential witnesses from information produced in discovery, but that is not what Rule 3 requires.

[¶37] The situation as to the allegedly exculpatory evidence–the negative urinalysis of a sample taken from CC–is less clear. This test result could have cast doubt on MC's testimony. As noted above, he testified that CC smoked marijuana, although the test result may mean that CC did not. The precise meaning of the test was not explained at the hearing.[9] The written test results are not in the record. Although the State argues that the test was not exculpatory in light of Appellant's theory, exculpatory evidence may consist of information which allows effective cross-examination of the State's witnesses. *Davis v. State*, 2002 WY 88, ¶ 14, 47 P.3d 981, 985 (Wyo. 2002) (citation omitted); *see also United States v. Bagley*, 473 U.S. 667, 676, 105 S. Ct. 3375, 3380, 87 L. Ed. 2d 481 (1985) ("Impeachment evidence, however, as well as exculpatory evidence, falls within the *Brady* [*v. Maryland*, 373 U.S. 83, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963)] rule.") (citing *Giglio v. United States*, 405 U.S. 150, 154, 92 S. Ct. 763, 766, 31 L. Ed. 2d 104 (1972)); *Smith v. Sec'y of N.M. Dep't of Corr.*, 50 F.3d 801, 825 (10th Cir. 1995) ("[B]ecause impeachment is integral to a defendant's constitutional right to cross-examination, there exists no pat distinction between impeachment and exculpatory evidence under *Brady*." (quoting *Ballinger v. Kerby*, 3 F.3d 1371, 1376 (10th Cir. 1993))).

[¶38] The county attorney was unaware of the existence of the negative test until he met with DFS caseworkers on the Thursday before the adjudicatory hearing, and he promptly disclosed the negative test to Appellant's counsel once he knew it existed. He indicated that he was misled by statements of a DFS caseworker, as well as by a police report saying that there was no drug testing on CC, which was consistent with information indicating that CC was unable or unwilling to provide a sample when asked.

---

[9] There is a common belief that THC associated with the use of marijuana remains in the blood stream for extended periods. Neither party sought to establish this at the adjudication hearing.

[¶39]  However, Rule 3(b)(1) does not require production of "any material or information within the knowledge, possession or control of the county attorney" or within the "knowledge, possession, or control of the attorney for the State."  It requires production of exculpatory information "within the knowledge, possession, or control of the State." We have previously assumed without deciding that Rule 3 is to be interpreted in light of *Brady* and its progeny because of the fundamental interests involved in abuse and neglect proceedings.  *MM*, ¶ 20, 202 P.3d at 415 (indicating that, under appropriate circumstances, *Brady* due process principles may apply in parental termination proceedings) (citing *LP v. Natrona Cnty. Dep't of Pub. Assist. & Social Servs.*, 679 P.2d 976, 992–94 (Wyo. 1984).

[¶40]  This case  does not warrant  an exegesis of the law governing disclosure of exculpatory evidence, but it is worth noting that in criminal cases convictions may be reversed when exculpatory evidence is suppressed by agents of the  state, whether innocently or in bad faith, depending on the circumstances.  *See, e.g., Arizona v. Youngblood*, 488 U.S. 51, 58, 109 S. Ct. 333, 337, 102 L. Ed. 2d 281 (1988); 9A *Federal Procedure, L. Ed*. §§ 22:1246, 22:1248 (2005 & Supp. 2012) (providing a helpful synopsis).

[¶41]  Our point is simply that law enforcement officers and Department of Family Services'  employees have some obligation to assure that exculpatory evidence is produced.  It would be wise for them to assume that the *Brady* rules may apply in juvenile court proceedings, and to make reasonable efforts to identify and provide that kind of evidence to the attorney for the State.

[¶42]  We understand that Appellant may not have lived up to her obligations, and that satisfactory informal information exchanges  often  occur  between attorneys who frequently oppose one another in the courtroom.  However, the juvenile court rules were the product of careful study by an advisory committee composed of members well-versed in juvenile proceedings, followed by review in this Court.  They were intended to assure a fair and efficient discovery process.  They are called rules for a reason–they are not suggestions or recommendations.  They should be followed unless otherwise stipulated or ordered by the trial court.

[¶43]  The district court determined that it was unnecessary to grant the drastic remedies of striking witnesses or dismissal.  With regard to the failure to provide a witness list, that omission would have become apparent well before the date of the hearing.  Appellant's counsel had a number of options beginning relatively early on. She might have filed a motion to compel as contemplated by Rule 3(f), but did not do so in order to "maintain civility."  Filing a motion to compel for good reasons is not uncivil–motions to compel are the mechanism by which discovery disputes are brought to the attention of the trial court for resolution.  Trial counsel might also have requested a continuance.  Instead of timely exercising these options under Rule 3, trial counsel waited until the  day of the

adjudicatory hearing and sought dismissal, a remedy not even specifically listed in Rule 3, or an alternative order striking the State's witnesses, which could be tantamount to a dismissal.

[¶44] Dismissal is a drastic remedy, and it is therefore seldom granted. *Robinson v. Pacificorp*, 10 P.3d 1133, 1135 (Wyo. 2000). However, we have upheld dismissals in civil cases in which a party's failure to live up to discovery obligations was sufficiently aggravated. *See, e.g., White v. State ex rel. Wyo. Dep't of Transp.*, 2009 WY 90, ¶ 14, 210 P.3d 1096, 1100 (Wyo. 2009); *Spitzer v. Spitzer*, 777 P.2d 587, 592 (Wyo. 1989). Abuse and neglect cases are not routine civil actions–the paramount concern in neglect and abuse proceedings is the "child's health, safety and welfare." Wyo. Stat. Ann § 14-3-201 (LexisNexis 2011). Dismissal might subject a child to continued abuse and neglect, as might an order striking the State's witnesses. The trial judge was not asked to consider lesser sanctions, and cannot be faulted for not adopting them on his own.

[¶45] The adjudicatory hearing was completed without a request for a recess to meet unanticipated testimony, suggesting that Appellant's attorney was ready to challenge the State's case. She conducted surgical and effective cross-examination tailored to the facts of the case. The trial judge was likewise not asked to adjourn the hearing and conclude it at a later date so that additional witnesses could have been called or so that further investigation could have been completed. Appellant rested and closing arguments were made. Understandably, the Court ruled on the merits at that point.

[¶46] With regard to the exculpatory evidence issue, the remedy for a *Brady* violation is a new trial, not a dismissal. *See Giglio*, 405 U.S. at 153-54, 92 S. Ct. at 766 (discussing how suppression of material exculpatory evidence warrants a new trial); *Monroe v. Angelone*, 323 F.3d 286, 293 n.5 (4th Cir. 2003) ("[A] Brady violation usually entitles a defendant to a new trial.") (citing *Spicer v. Roxbury Corr. Inst.*, 194 F.3d 547, 562 (4th Cir. 1999)). The claimed violation of Rule 3 occurred before the adjudication hearing, and a continuance might therefore have been an appropriate remedy to allow investigation into the negative UA and listing of appropriate experts. *See Rullo v. Gen. Motors Corp.*, 543 A.2d 279, 282 (Conn. 1988) ("A continuance is ordinarily the proper method for dealing with a late disclosure."); *State v. Higginbotham*, 329 N.W.2d 250, 254 n.2 (Wis. Ct. App. 1982) ("A continuance is a more appropriate remedy for surprise than is the exclusion of the witness.").

[¶47] In addition, DFS caseworker Rossler testified without objection to the results of the urinalysis, and the validity of the test was never challenged by the State. It is true that there was no testimony as to the meaning of the test–*i.e.*, did it mean that CC did not smoke marijuana the night before the sample was taken? Ms. Rossler was not asked to address this question, which she may or may not have been qualified to do. Appellant did not seek a continuance to locate an expert who could testify as to the significance of the negative test result.

15

[¶48] In summary, Appellant had a number of options to address any prejudice claimed to have resulted from the discovery issues she has identified, and she could have exercised them during the hearing as well as before. If the process was not all she thinks in retrospect it should have been, any shortcomings could have been corrected by appropriate motions to compel, to continue, or for other appropriate relief. *See Betts v. Crawford*, 965 P.2d 680, 685 (Wyo. 1998) ("[T]he appropriate response from a surprised party who wishes to counter testimony is a request for a continuance, and the failure to request one precludes a claim of prejudice.").

[¶49] Because these motions were never made, the trial court had no opportunity to address the problems now claimed to have arisen. Under the circumstances, the court did not abuse its discretion in declining to grant the drastic remedies of dismissing the petition or striking the State's witnesses. Appellant has likewise failed to establish that she did not receive a fundamentally fair hearing. *Cf. James v. Kelly*, 648 F. Supp. 397, 403–04 (E.D.N.Y. 1986) (holding that a late disclosure of inconsistent eyewitness identifications did not violate a defendant's due process rights where trial counsel requested no continuance and rigorously cross-examined the witness on the inconsistencies). Due process requires a fair trial, not a perfect one, and the hearing Appellant received was fair. *Garnick v. Teton Cnty. Sch. Dist. #1*, 2002 WY 18, ¶ 33, 39 P.3d 1034, 1048 (Wyo. 2002); *see also United States v. Hasting*, 461 U.S. 499, 508–09, 103 S. Ct. 1974, 1980, 76 L. Ed. 2d 96 (1983) ("[G]iven the myriad safeguards provided to assure a fair trial, and taking into account the reality of the human fallibility of the participants, there can be no such thing as an error-free, perfect trial, and that the Constitution does not guarantee such a trial."); *Jentges v. Milwaukee Cnty. Cir. Ct.*, 733 F.2d 1238, 1244 (7th Cir. 1984) ("The Constitution guarantees a fair trial, not a perfect one . . . .").

### *Sufficiency of Evidence of Neglect*

[¶50] Wyoming Statute § 14-3-202(a)(vii) defines "neglect" as follows:

> "Neglect" means a failure or refusal by those responsible for the child's welfare to provide adequate care, maintenance, supervision, education or medical, surgical or any other care necessary for the child's well being.

Wyo. Stat. Ann. § 14-3-202 (a)(vii) (LexisNexis 2011).

[¶51] Appellant argues that the evidence was insufficient to sustain a finding of neglect as a matter of law. She contends that the unsanitary and unkempt condition of the home on January 26, 2012 was attributable to illness, and that a single instance of clutter could not be neglect. Even if such an event could be considered neglect, she claims, her

children were old enough to clean their own rooms and the home's common areas. She further asserts that her own testimony established that there was in fact adequate heating in her home, that there was no foul smell, and that animal feces was not scattered throughout the house. Appellant also contends that isolated "[m]arijuana use alone . . . is not enough to constitute neglect."

[¶52] Appellant's approach to the issues in this case ignores our usual standard of review. "As an appellate court, we are not fact finders in the first instance." *Baker v. Pena*, 2001 WY 122, ¶ 16, 36 P.3d 602, 608 (Wyo. 2001). The trial court is charged with determining the facts, and we "do not substitute ourselves for the trial court as a finder of facts." *Claman v. Popp*, 2012 WY 92, ¶ 22, 279 P.3d 1003, 1012 (Wyo. 2012) (quoting *Pennant Serv. Co., Inc. v. True Oil Co., LLC*, 2011 WY 40, ¶ 7, 249 P.3d 698, 703 (Wyo. 2011)). Rather, as described above, we disregard the Appellant's evidence and resolve all evidentiary conflicts in favor of the State when reviewing for sufficiency of the evidence. "The question is whether the evidence, examined in the light most favorable to the State, . . . leads to the conclusion that, more likely than not, the children were neglected." *"H" Children*, ¶ 58, 79 P.3d at 1013.

[¶53] The State's case and the district court's ruling both relied heavily on MC's testimony. MC is a young man whose credibility might be subject to reasonable dispute, and it was. However, the trial court had the opportunity to observe his demeanor and that of the other witnesses, including Appellant, and to evaluate that testimony in light of surrounding circumstances which were not disputed. The Court found MC to be credible after engaging in that evaluation. We defer to the trial judge to resolve disputes of fact precisely because he or she has the opportunity to see and hear witnesses and evaluate evidence. *See Lawrence v. City of Rawlins*, 2010 WY 7, ¶ 13, 224 P.3d 862, 868 (Wyo. 2010) ("Due regard is given to the opportunity of the trial judge to assess the credibility of the witnesses."); *Matter of SKJ*, 673 P.2d 640, 642 (Wyo. 1983) (noting our own limitations in reading a cold record, including how the trial judge "has the advantage of witnessing the demeanor of those who testify in order to determine their credibility, detect prejudice, motives, feelings of revenge and interest in the outcome of the trial").

[¶54] The evidence, viewed in the light most favorable to the State, indicated that: (1) the children's food was rotten, and that it came from the dumpsters of nearby grocery stores; (2) there were bloodied cloth rags strewn about the upstairs bathroom; (3) there was a foul smell throughout the house; (4) MC's room lacked an apparent heat source and was cold; (5) water leaked from the bathroom into MC's room; (6) dog and cat feces remained on the floors without being cleaned up; and (5) trash and dirty laundry was scattered around the house. Several pictures attached to the State's petition for neglect

confirmed the general state of disarray.[10]  Deputy Simeral and Ms. Rogers both testified that they believed the condition of the house posed a serious health risk to the children.

[¶55]  Whether keeping a cluttered home is sufficient to establish neglect may certainly be subject to debate in certain instances.  We have recognized that "slovenliness in keeping a young child clean or his home in good order may offend many of us and may, by some, be characterized as neglect, but is not such neglect–assuming no serious health effect or risk . . . ." *DS v. Dep't of Pub. Assistance & Soc. Servs.*, 607 P.2d 911, 919 (Wyo. 1980).   On the other end of the  spectrum, we have recognized a child's "fundamental right to live in an environment free from filth, health hazards and danger," and noted that "[t]he appropriate state agency need not wait for a catastrophic event to occur before it takes action." *In re MLM*, 682 P.2d 982, 990 (Wyo. 1984).

[¶56]   The trial court found that the evidence of an unsanitary and unkempt home summarized above constituted neglect.   We find the evidence sufficient to support that finding.

[¶57]  Appellant also contends that her marijuana use did not constitute neglect because the State "did not prove any nexus of Appellant's marijuana use tied to any neglect of the children."   We will evaluate this issue in conjunction with the  evidence  already described, and determine whether the  State introduced sufficient evidence to connect Appellant's use of marijuana to her failure or refusal to provide adequate care for her children, and thereby proved that her marijuana use was harmful to them. *See MLM*, 682 P.2d at 990; *In re ATE*, 2009 WY 155, ¶¶ 24–25, 222 P.3d 142, 148 (Wyo. 2009) (affirming the district court's decision to not terminate parental rights where "there was evidence of Father's use of marijuana, but DFS did not provide evidence to connect his marijuana use with his unfitness as a parent"); *see also In re J.B.*, 40 So. 3d 917, 918 (Fla. Dist. Ct. App. 2010) ("The upshot of the testimony at the dependency hearing was that R.M. was a chronic marijuana user and the boy was placed in danger when she was under the drug's influence . . . establishing a nexus between the mother's drug use and the potential for J.B.'s neglect."); *Dep't of Human Servs. v. C.Z.*, 443, 236 P.3d 791, 794–95 (Or. Ct. App. 2010) (reversing the trial court's assertion of jurisdiction over a child endangerment proceeding where there was no evidence linking the appellant's drug use to conditions that would pose any risk to her children).

[¶58]  The State presented testimony that Appellant kept marijuana and a glass pipe for smoking it in a location accessible to her children.  When he executed the search warrant, Deputy Simeral found the red tin containing these items in the location identified by twelve-year-old CC.  MC testified that he was "pretty sure" that his brother and sister

---

[10] These pictures were offered and received into evidence as State's Exhibits 1–4 at the adjudication hearing.  The exhibits were not designated as part of the appellate record. However, the same pictures were attached to the petition alleging neglect, and designated as part of the record on appeal.

knew where the marijuana was kept, that Appellant did not interact with her children when she was under the influence of marijuana, and that she also became irritable and edgy at those times. Ms. Rogers also testified that Appellant told her that she would not quit using marijuana, and that "DFS has always wanted to break up her family, and if that's what happened, that's what happened."

[¶59] This is not a case of Appellant smoking marijuana occasionally when her children were not around. The juvenile court found that "the use of marijuana has contributed and jeopardized the health and safety of [CC]." The court also found that: "The point is your kids are now using. Your 12-year-old shows up half baked at school. As a result of that the Court finds that it has jeopardized your children's health and safety and welfare." The trial judge indicated that creating an environment in which the open use of a controlled substance by a parent was the norm constituted neglect. The evidence supports this finding.

[¶60] Appellant points out that CC's negative urinalysis may have indicated that he did not in fact use marijuana as he told school officials and as MC testified, and we have acknowledged that possibility above. When we review a bench trial for sufficiency of the evidence, "[w]e may affirm a district court's action upon any sustainable legal ground shown in the record." *Bellis v. Kersey*, 2010 WY 138, ¶ 10, 241 P.3d 818, 822 (Wyo. 2010) (quoting *Hoy v. DRM, Inc.*, 2005 WY 76, ¶ 21, 114 P.3d 1268, 1279 (Wyo. 2005)). The court's finding that CC showed up "half-baked" at school may be debatable given the negative urinalysis, but it is undisputed that this twelve-year-old claimed to have used marijuana and to be experiencing the after-effects of doing so. He also knew where Appellant kept marijuana, because he told Deputy Simeral where to find the drugs. The trial court could reasonably conclude that it is neglectful to expose a twelve-year-old child to the use of marijuana to the extent that he is knowledgeable as to its effects and able to find it in the home. We therefore conclude that the State produced sufficient evidence of neglect to support the trial court's finding as to the use and availability of marijuana. *In re K.L.S.*, 2004 WY 87, ¶ 16, 94 P.3d 1025, 1029 (Wyo. 2004) ("[N]eglect is usually manifested by numerous incidents and conditions extending over a considerable length of time.") (citing *MLM*, 682 P.2d at 988).

## CONCLUSION

[¶61] The trial court did not abuse its discretion or fail to provide fundamental due process by virtue of its ruling on the parties' discovery dispute. The evidence presented at the adjudicatory hearing was sufficient to support a finding of neglect. We therefore affirm.