# IN THE SUPREME COURT, STATE OF WYOMING

## 2024 WY 28

**OCTOBER TERM, A.D. 2023**

**March 13, 2024**

IN THE INTEREST OF AE, minor child:

CE and AE,

Appellants
(Respondents),

v.

THE STATE OF WYOMING,

Appellee
(Petitioner).

S-23-0231

*Appeal from the District Court of Hot Springs County*
*The Honorable Bobbi Dean Overfield, Judge*

*Representing Appellants:*
   *Christopher J. King, Worland, Wyoming.*

*Representing Appellee:*
   *Bridget Hill, Attorney General; Christina F. McCabe, Deputy Attorney General; Wendy S. Ross, Senior Assistant Attorney General; Callie R. Papoulas, Assistant Attorney General.*

*Office of the Guardian ad Litem:*
   *Joseph R. Belcher, Director; Kimberly Skoutary Johnson, Chief Trial and Appellate Counsel.*

*Before FOX, C.J., and KAUTZ, BOOMGAARDEN, GRAY, and FENN, JJ.*

**NOTICE: This opinion is subject to formal revision before publication in Pacific Reporter Third. Readers are requested to notify the Clerk of the Supreme Court, Supreme Court Building, Cheyenne, Wyoming 82002, of any typographical or other formal errors so that correction may be made before final publication in the permanent volume.**

**FOX, Chief Justice.**

[¶1]    Mother challenges the sufficiency of the evidence to support the juvenile court's finding that she neglected her infant son, AE. We affirm.

*ISSUE*

[¶2]    This appeal presents one issue: Was the evidence sufficient to support the juvenile court's adjudication of neglect against Mother?

*FACTS*

[¶3]    AE was born in September 2022. He was the fourth child of Mother and Father who live together in Thermopolis, Wyoming. AE was born about four weeks premature, and at birth, his weight put him in the 25th percentile on the growth chart.

[¶4]    Mother took AE for wellness checks to Dr. Peter Sidor, a pediatrician in Cody, Wyoming. In November 2022, Dr. Sidor saw AE and observed him "to be significantly underweight, malnourished, and having an upper respiratory tract infection." Dr. Sidor directed Mother to take AE to the hospital in Cody, and that hospital referred her to St. Vincent's Hospital in Billings, Montana. AE was admitted to St. Vincent's with a failure to thrive diagnosis. He had improved caloric intake and good weight gain during his stay and was discharged about a week after his admission.

[¶5]    Mother followed up with Dr. Sidor after AE was discharged from St. Vincent's, and he directed her to set up a schedule with Public Health to monitor AE's weight gain. Mother did as instructed, but in February 2023, she rescheduled one of AE's weigh-ins from Tuesday, February 21, to Thursday, February 23. When Dr. Sidor learned of this, he contacted the Department of Family Services (DFS). On February 22, a DFS employee and a law enforcement officer came to the home and advised Mother to immediately take AE for his weigh-in.

[¶6]    After AE was weighed, DFS caseworker Anna Rossler recommended Mother take him to the hospital in Thermopolis because he had gained so little weight since his last weigh-in. Mother took AE to the hospital that day, and doctors there found he was below the second percentile on the growth chart and lacked the head and trunk strength expected of an infant his age. AE was admitted to the hospital with a diagnosis of failure to thrive and malnutrition. The risks associated with failure to thrive include delays in neurologic development, which can be permanent, and an impaired immune system.

[¶7]    AE's attending physician, Dr. Travis Bomengen, evaluated AE to determine whether the cause of his failure to thrive was organic or inorganic. Organic causes are those the child is born with such as problems with the thyroid or adrenal glands,

1

absorption issues, or mechanical issues with swallowing. Inorganic causes are those outside the child such as caloric intake, parent/child interaction, or disruption or stress within the child's life. Dr. Bomengen found no evidence of an organic cause and determined the cause of AE's failure to thrive was inadequate caloric intake.

[¶8] AE's caloric intake was monitored during his stay at the Thermopolis hospital, and with supplemental feeding of formula, he had adequate weight gain. The hospital staff also observed Mother with AE and worked with her on how to position AE to enhance his feeding. Dr. Bomengen and the nursing staff had concerns with Mother's attentiveness to AE, her patience and persistence in feeding, and her interaction with AE. Dr. Bomengen was also concerned that a lack of bonding between Mother and AE contributed to AE's failure to thrive.

[¶9] On Saturday, February 25, 2023, Dr. Bomengen took protective custody of AE. His basis for protective custody was that while twice hospitalized, AE gained adequate weight, but in his home, he failed to thrive. His greatest concern was AE's development and that he be in an environment where caloric intake and weight gain could be monitored and ensured.

[¶10] After taking protective custody of AE, Dr. Bomengen contacted DFS. DFS took protective custody of AE and placed him in non-relative foster care. On February 27, 2023, the State filed a petition in juvenile court alleging that Mother and Father had neglected AE. The petition alleged that Mother and Father had failed or refused to provide adequate care and maintenance necessary for the child's well-being. The caseworker affidavit attached to the petition attested that AE had gained one ounce over an eight-day period under Mother and Father's care, and five ounces over a two-day period while hospitalized.

[¶11] Following a combined initial and shelter care hearing, the juvenile court ordered that AE remain in the legal custody of DFS, and that he remain in foster care. The court ordered that Mother and Father were to have "reasonable and liberal supervised visitation," and DFS was to seek an appropriate family placement. The court also ordered that a Multi-Disciplinary Team (MDT) be formed to monitor visitation and adjust visitation and physical custody of AE as appropriate.

[¶12] On April 17, 2023, AE was transferred from non-relative foster care to foster care with his maternal grandmother.[1] On May 11, 2023, the juvenile court held an evidentiary

---

[1] Sometime in March 2023, while AE was in his first foster home, he became seriously ill with multiple respiratory viruses, including parainfluenza. He was flown to Denver Children's Hospital where he remained for about ten days. By the time of an April 4 MDT meeting, he was back in his foster home and doing well.

hearing on the State's neglect petition. The court heard testimony from Dr. Bomengen, Ms. Rossler (the DFS caseworker), and Mother and Father. After hearing the evidence, the court concluded the State had met its burden of proving Mother neglected AE. Relevant to that conclusion, the court found:

> The evidence before the Court, we have little [AE] who was apparently born early, had some issues from the very beginning; low birth weight, he was maybe not quite four weeks early, substantially early, from no testimony, but just from the Court's experience we know babies are supposed to come at 40 weeks. So four weeks is a lot of time when we're dealing with a kid at that developmental stage.

> There was evidence that he started out at the 25th percentile. At the time of placement it was testified that he was in the 2nd percentile. That's a fairly significant drop from 25 to 2 in five to five and a half months, it sounds like, based on the testimony.

> . . .

> Neglect in and of itself seems to allude that someone is purposefully doing something wrong, did something wrong. That's not the legal standard. There's nothing in there that requires a finding that somebody purposefully did something wrong or intentionally did something wrong, or intentionally was specifically told to do something that they didn't do. The only evidence to support that in this particular situation was maybe Dr. Bomengen's statement that he believed Mom was given specific directions when she left St. Vincent's to feed the child in a certain way or in a certain amount. There's no evidence particularly that she was or wasn't doing that.

> The only evidence to support this particular case, that the Court can find, is when the child was in the hospitals' care it was gaining more weight than it was gaining at home. In this particular situation, that happened twice. It does appear to be a pattern, for some reason, whatever was going on at that home, was not sufficient enough to help this child meet the weight gains that he needed to be meeting, and that was necessary for his well-being. That doesn't mean that they were necessarily doing something purposefully, but I think beyond the preponderance of the evidence is enough for the

3

Court to find that there was some failure to provide adequate care, or the care necessary for the child's well-being, based on how he showed up to Hot Springs County Health on [February] 22.

So as it relates to that, the testimony in regards to Mom's involvement, Mom's knowledge of the situation beyond a preponderance of the evidence the Court will find that there was neglect against – not really against, but in the situation of the minor child, [AE], and the mother, [AE].

As it relates to father, with the evidence that was presented to the Court today the Court can't make that finding because the evidence is they lived in a house, that this was his child, and that's about all the evidence advocated to Dad here today. We can try to lump it together and bootstrap the dad in here, but there isn't evidence to do that. And the Court's not able to make that finding here today, even with the low burden of a preponderance of the evidence. Presumably Dad is in the home, Dad knows what's going on, but that's just a presumption on the Court's part. That's as far as the Court can go on that.

[¶13]  By the time of the adjudication hearing, AE was doing well in foster care, and had gained significant weight and progressed developmentally. Ms. Rossler testified that Mother and Father had been cooperative and done well with visitations and she had no concerns with AE returning to his home with Mother and Father so long as they maintained feeding logs and monitored his weight. Thus, after ruling on the neglect petition, the juvenile court heard argument on whether AE should remain in foster care or be returned to his home with Mother and Father. The court ordered that AE be returned to his parents and that pending disposition, the parents were to maintain a feeding log and DFS was to continue to monitor AE's progress.

[¶14]  On July 28, 2023, the juvenile court issued its adjudication order. Mother timely appealed the adjudication of neglect to this Court.[2]

---

[2] On August 3, 2023, the juvenile court entered an order of disposition in this case, and on September 3, 2023, it closed the case.

*STANDARD OF REVIEW*

[¶15] In her sole issue on appeal, Mother challenges the sufficiency of the evidence to support the juvenile court's finding of neglect against her.

> Our review of the sufficiency of evidence to sustain a finding of neglect is governed by the following principles: First, we give considerable deference to the trial court's determination because it has the advantage to judge the demeanor and intelligence of the witnesses; second, we examine the evidence in the light most favorable to appellee and resolve all conflicts in evidence for appellee; and third, we assume as true the evidence in appellee's favor, disregard entirely appellant's evidence in conflict with appellee's evidence, and give to appellee's evidence every favorable inference that may fairly be drawn.

*Interest of NP*, 2017 WY 18, ¶ 12, 389 P.3d 787, 791 (Wyo. 2017) (citing *KC v. State*, 2015 WY 73, ¶ 18, 351 P.3d 236, 242 (Wyo. 2015)); *In re "H" Child.*, 2003 WY 155, ¶ 54, 79 P.3d 997, 1012 (Wyo. 2003).

## DISCUSSION

[¶16] "'Neglect' means a failure or refusal by those responsible for the child's welfare to provide adequate care, maintenance, supervision, education or medical, surgical or any other care necessary for the child's well[-]being." Wyo. Stat. Ann. § 14-3-202(a)(vii) (2023). At trial, the State had to prove its allegations of neglect by a preponderance of the evidence. *NP*, 2017 WY 18, ¶ 20, 389 P.3d at 792; Wyo. Stat. Ann. § 14-3-425(a) (2023).

[¶17] Mother contends the juvenile court's finding of neglect was unsupported by the evidence because there was no evidence of a failure or refusal by her to provide adequate care for AE. She argues the evidence showed, and the court found, that Mother took AE to medical appointments and followed directions to take him to the hospital. She also points to testimony from Dr. Bomengen that he could not say that a low weight or failure to meet developmental milestones means a parent is neglecting their child and that he could not say that Mother and Father had neglected AE.

[¶18] Mother's arguments ignore the confines of our standard of review. We do not reweigh the evidence on appeal; we instead must disregard the evidence that does not support the juvenile court's determination. *NP*, 2017 WY 18, ¶ 22, 389 P.3d at 793. The juvenile court emphasized the evidence that AE gained adequate weight both times he was hospitalized and failed to thrive when he returned home. The weight the court gave

that evidence is entitled to our deference. *Id.* Moreover, we have recognized that differences in a child's condition between care settings can be evidence of neglect.

> While under the care of his parents, Minor Child was significantly developmentally delayed. His gross motor skills were in the first percentile, and his fine motor skills were in the second percentile. These developmental delays were attributed to the parents' failure to provide a nurturing or stimulating environment. Testimony revealed that social workers never saw the parents or extended family interact with the child, the house was so cluttered and filthy that the child could not roll over if placed on the floor, and the child was constantly observed in his stroller. At the age of one, the child could not hold up his own head, could not crawl, could not talk, and did not know how to use his fingers. ***Furthermore, after a period of placement in foster care, Minor Child improved dramatically. His gross motor skills improved to the seventieth percentile and his fine motor skills increased to the fifty-second percentile. Hence, it is reasonable to conclude that the developmental deficiencies displayed by Minor Child were the result of neglect by his parents***.

*SD v. Carbon Cnty. Dep't of Fam. Servs.*, 2002 WY 168, ¶ 13, 57 P.3d 1235, 1239 (Wyo. 2002) (emphasis added).

[¶19] Although the evidence of neglect was greater in *SD*, it was reasonable for the juvenile court in this case to give weight to the differences in AE's ability to thrive in a hospital setting versus his home. We will not disturb the weight the court gave that evidence when it was in the best position to observe the demeanor of the parties and assess the weight of all the evidence it considered. *NP*, 2017 WY 18, ¶ 12, 389 P.3d at 791. The evidence was thus sufficient to support the adjudication of neglect.

[¶20] Affirmed.