# THE SUPREME COURT, STATE OF WYOMING

## 2025 WY 95

**APRIL TERM, A.D. 2025**

**August 27, 2025**

IN THE INTEREST OF MC, minor child:

CC,

Appellant
(Respondent),

v.                                                                                      S-25-0032

THE STATE OF WYOMING,

Appellee
(Petitioner).

*Appeal from the District Court of Carbon County*
*The Honorable Dawnessa A. Snyder, Judge*

*Representing Appellant:*
    H. Michael Bennett of the Bennett Law Group, P.C., Laramie, Wyoming.

*Representing Appellee:*
    Bridget Hill, Attorney General; Christina F. McCabe, Deputy Attorney General;
    Wendy S. Ross, Senior Assistant Attorney General; Rebekha K. Dostal, Senior
    Assistant Attorney General.

*Guardian ad Litem:*
    Joseph R. Belcher, Director, and Kim Skoutary Johnson, Chief Trial and
    Appellate Attorney for the Wyoming Office of Guardian ad Litem.

*Before BOOMGAARDEN, C.J., and FOX\*, GRAY, FENN, and JAROSH, JJ.*

* Justice Fox retired from judicial office effective May 27, 2025, and, pursuant to Article 5, § 5 of the
Wyoming Constitution and Wyo. Stat. Ann. § 5-1-106(f) (2023), she was reassigned to act on this
matter on May 28, 2025.

NOTICE:  This opinion is subject to formal revision before publication in Pacific Reporter Third.  Readers are requested to notify the Clerk of the Supreme Court, Supreme Court Building, Cheyenne, Wyoming 82002, of any typographical or other formal errors so that correction may be made before final publication in the permanent volume.

**FENN, Justice.**

[¶1]    Father challenges the sufficiency of the evidence supporting the juvenile court's finding he neglected his infant daughter, MC.  We affirm.

## ISSUE

[¶2]    Father raises one issue, which we rephrase as: Was there sufficient evidence to support the juvenile court's finding of neglect against Father?

## FACTS

[¶3]    CC (Father) and HK (Mother) are the parents of MC.  MC was born in early June 2024 while Father and Mother were in separate inpatient treatment facilities.  Father's and Mother's other three children were in the legal custody of the Department of Family Services (DFS) at that time by virtue of a separate juvenile case.  Those three children were residing in relative foster care.

[¶4]    After her birth, MC lived at the treatment facility with Mother.  However, Mother struggled to provide basic care for MC while attaining her treatment goals, and the treatment facility asked DFS to find an alternative placement for the infant.  DFS placed MC with her paternal grandmother, BC (Grandmother).  On July 23, 2024, Father completed inpatient treatment, went to live with Grandmother, and began providing care for MC.  As part of his ongoing juvenile case with his other children, Father was required to go to DFS's office three times a week to provide urinalysis tests (UAs) to verify he was not using controlled substances.

[¶5]    MC was born premature and slightly small.  As a result, she needed to be transported in a special lay-down car seat, instead of a standard car seat, or her oxygen levels would drop to unsafe levels.  When DFS workers delivered MC to Grandmother, they explained the importance of using the specialized car seat and told Grandmother that MC could not ride in a standard car seat until she passed a car seat challenge.  During a car seat challenge, an infant's oxygen levels are monitored while sitting in a standard car seat for a certain amount of time to ensure it is safe for the child to progress from riding in the lay-down car seat to a standard car seat.  Although DFS workers did not personally inform Father about the importance of the lay-down car seat, he was aware of this information, and he personally scheduled her car seat challenge for August 9, 2024.

[¶6]    On August 7, 2024, Father arrived at DFS's office to provide a UA.  He brought MC with him in a standard car seat.  Father tested presumptive positive for methamphetamine.  Due to the presumptive positive test, Father's DFS caseworker, Joel Christiansen, asked Father to leave MC with DFS and complete a voluntary case plan.  Father complied.  Mr. Christiansen asked Father about MC being in the standard car seat,

1

and Father said MC "was good." Mr. Christiansen believed this statement meant MC had passed the car seat challenge. After Father left the DFS office, Mr. Christiansen contacted the Rawlins Police Department and asked if an officer would take protective custody of MC due to Father's presumptive positive UA. He was told they could not do so because they had not witnessed the UA and could not say with certainty the sample had been provided by Father.

[¶7]    Mr. Christiansen had to leave for a meeting in another case, so he asked another DFS worker, Tiffany Jaure, to watch MC until a babysitter could get there. Ms. Jaure noticed MC's face and body appeared to be gray in color, and she immediately removed MC from the car seat. Ms. Jaure contacted the clinic across the street from DFS's office, and she was told to bring MC in right away. While at the clinic, a nurse practitioner examined MC and discovered her oxygen levels dropped into the low 70s after being placed back in the standard car seat for only a few minutes. The nurse practitioner made several phone calls and confirmed MC had not passed the car seat challenge. The nurse practitioner felt the parents had endangered MC by placing her in a standard car seat before she passed the car seat challenge, so she placed MC into protective custody.

[¶8]    On August 8, 2024, the State filed a neglect petition against both parents. Although both parents initially denied the allegations, Mother entered into a consent decree shortly before the adjudicatory hearing. The juvenile court conducted an evidentiary adjudicatory hearing on the neglect allegations against Father on October 28, 2024.

[¶9]    At the adjudicatory hearing, Father denied using any methamphetamine, even though his UA tested positive for that substance. He admitted he knew MC was supposed to be transported in the specialized car seat, she had not progressed to the standard car seat yet, and he chose to put her in a standard car seat because he believed MC was too big to fit comfortably in the lay-down car seat. He further admitted he did not consult with her medical providers before deciding to transport MC in a standard car seat.

[¶10]  Mr. Christiansen testified DFS sent Father's presumptive positive UA to the lab, which confirmed Father had a "low amount of methamphetamine in his system." He admitted Father did not exhibit any signs of being under the influence of methamphetamine. However, he testified there is a concern that someone who is caring for a child, especially an infant, while under the influence of methamphetamine may cause cross-contamination from skin-to-skin contact. In addition, the parent's ability to accurately observe the child and judge a situation may be compromised, and a parent coming down from methamphetamine may experience fatigue and increased inattentiveness.

[¶11]  When asked about the car seat, Mr. Christiansen testified Father had sent him a text message in late July saying he had scheduled MC's car seat challenge. When Father came in for the UA on August 7, 2024, Mr. Christiansen could not remember when the test was

2

scheduled, and he believed Father represented MC had passed the car seat challenge when he said she "was good." Later, he reviewed his text messages and learned Father had told him MC's car seat challenge was scheduled for August 9, 2024, two days after Father had brought MC to DFS's office in the standard car seat. Ultimately, MC passed a car seat challenge on August 19, 2024.

[¶12] Mr. Christiansen testified after the nurse practitioner took protective custody of MC, he contacted Grandmother about continuing to be the child's alternative caregiver. When she came to pick up MC, Grandmother brought the lay-down car seat to DFS. Ms. Jaure testified MC fit into the lay-down car seat on August 7, 2024, and it was not too small for her.

[¶13] After hearing the evidence presented by the State, the juvenile court found the State met its burden of proving the neglect allegations against Father by a preponderance of the evidence. The juvenile court was most concerned about Father's positive methamphetamine test, but it also took the "car seat incident" into consideration. The juvenile court found Father "knew that the child needed to be in a specialized car seat and brought her in a different one." The juvenile court also considered Father's recent inpatient treatment and history of substance abuse. The juvenile court entered an adjudication of neglect, finding "it [was] more likely than not [Father] neglected [MC] by providing care at a time when he was under the influence of a substance. And that he drove [MC] to DFS with methamphetamine in his system is also very alarming." The juvenile court's written order indicated the State proved Father neglected MC "by use of methamphetamine and not using a specialized car seat while caring for the minor child." This appeal timely followed.

## STANDARD OF REVIEW

[¶14] In his sole issue on appeal, Father challenges the sufficiency of the evidence supporting the juvenile court's finding he neglected MC.

> Our review of the sufficiency of evidence to sustain a finding of neglect is governed by the following principles: First, we give considerable deference to the trial court's determination because it has the advantage to judge the demeanor and intelligence of the witnesses; second, we examine the evidence in the light most favorable to appellee and resolve all conflicts in evidence for appellee; and third, we assume as true the evidence in appellee's favor, disregard entirely appellant's evidence in conflict with appellee's evidence, and give to appellee's evidence every favorable inference that may fairly be drawn.

3

*In re AE*, 2024 WY 28, ¶ 15, 544 P.3d 1113, 1116 (Wyo. 2024) (quoting *In re NP*, 2017 WY 18, ¶ 12, 389 P.3d 787, 791 (Wyo. 2017)).  "The [juvenile] court is charged with determining the facts, and we 'do not substitute ourselves for the [juvenile] court as a finder of facts.'" *In re MC*, 2013 WY 43, ¶ 52, 299 P.3d 75, 86 (Wyo. 2013) (quoting *Claman v. Popp,* 2012 WY 92, ¶ 22, 279 P.3d 1003, 1012 (Wyo. 2012)).

## DISCUSSION

[¶15] The Child Protection Act defines "neglect" as "a failure or refusal by those responsible for the child's welfare to provide adequate care, maintenance, supervision, education or medical, surgical or any other care necessary for the child's well-being." *In re AE*, ¶ 16, 544 P.3d at 1116 (quoting Wyo. Stat. Ann. § 14-3-202(a)(vii) (2023)).  At the adjudicatory hearing, the State had to prove the allegations of neglect against Father by a preponderance of the evidence. *Id.* (citing *In re NP*, ¶ 20, 389 P.3d at 792; Wyo. Stat. Ann. § 14-3-425(a) (2023)).  "A preponderance is proof 'it was more likely than not that neglect occurred.'" *In re RTB*, 2024 WY 75, ¶ 17, 552 P.3d 365, 370 (Wyo. 2024) (quoting *In re "H" Child.*, 2003 WY 155, ¶ 54, 79 P.3d 997, 1012–13 (Wyo. 2003)).  "An adjudication of neglect does not require actual harm to the child: Neglect may be predicated on 'imminent danger to the physical or mental health or welfare of the child.'" *In re CF*, 2005 WY 52, ¶ 15, 110 P.3d 283, 287 (Wyo. 2005) (quoting Wyo. Stat. Ann. § 14-3-402(a)(xii)(B) (2003)).  "'Imminent danger' includes threatened harm and means a statement, overt act, condition or status which represents an immediate and substantial risk of sexual abuse or physical or mental injury." Wyo. Stat. Ann. § 14-3-202(a)(ii)(D).

[¶16] Father asserts the juvenile court's neglect finding was not supported by sufficient evidence because "the State's evidence was that he was not under the influence of methamphetamine at any time pertinent to the events of August 7, 2024."  Father admits the State elicited testimony about the dangers of caring for children while under the influence of methamphetamine and "those dangers are valid," but he asserts the juvenile court "could only consider them if there were evidence to support such consideration."  He contends his positive UA only shows he used methamphetamine at some point prior to arriving at DFS's office, not that he was under the influence.  He argues he did not neglect MC "simply because he provided a positive UA but was not obviously under the influence."

[¶17] Father is correct that we have held there must be a nexus between his positive UA and his alleged failure or refusal to provide adequate care for MC. *See In re RTB*, 2024 WY 75, ¶ 18, 552 P.3d at 370 (citing Wyo. Stat. Ann. § 14-3-202(a)(vii)) (holding there must be a "nexus" between a positive UA test and a finding of neglect under Wyoming Statute § 14-3-202(a)(vii)); *In re MC*, 2013 WY 43, ¶¶ 57–60, 299 P.3d at 87–88 (stating we review whether there is evidence linking the parent's drug use to the conditions that place the children in danger).  The State proved such a nexus in this case.  The State presented evidence showing Father tested positive for methamphetamine on August 7,

4

2024. While Father may not have been displaying signs of being "obviously under the influence" of methamphetamine while at DFS's office, it was reasonable for the juvenile court to infer he must have taken the methamphetamine sometime between getting out of treatment on July 23, 2024, and arriving at the DFS office with MC in his care. Father testified he had been providing care for MC ever since he was released from treatment. Thus, the State presented evidence it was more likely than not Father provided care for MC at a time when he had methamphetamine in his system. Mr. Christiansen testified about his concerns regarding leaving a child in the care of someone under the influence of methamphetamine. The juvenile court found Mr. Christiansen's testimony about cross-contamination, fatigue, and inattentiveness "very compelling," and it noted these concerns were "exacerbated" when dealing with a two-month-old infant like MC. Further, the State presented evidence Father drove MC to DFS's office with methamphetamine in his system. The juvenile court could reasonably conclude caring for MC with methamphetamine in his system posed an "imminent danger" to MC's physical health and constituted neglect. *See* Wyo. Stat. Ann. § 14-3-202(a)(ii)(D); Wyo. Stat. Ann. § 14-3-402(a)(xii)(B); *see also In re CF*, 2005 WY 52, ¶ 15, 110 P.3d at 287–88.

[¶18] In addition to the evidence relating to Father's methamphetamine use, the State presented evidence showing Father knew MC needed to be transported in the lay-down car seat, but he chose to transport her in a standard car seat, even though he knew she had not passed the car seat challenge. Father did not consult with MC's medical provider to make sure it was safe to use the standard car seat. Father attempts to blame DFS for leaving MC in the standard car seat for an extended period. Yet the evidence showed MC's oxygen level dropped to concerning levels after being in the standard car seat for only a few minutes while at the clinic. MC did not pass the car seat challenge until 12 days later. Based on this evidence, the juvenile court could reasonably conclude Father's decision to transport MC in a standard car seat posed an imminent danger to her physical health and constituted neglect. *See* Wyo. Stat. Ann. § 14-3-202(a)(ii)(D); Wyo. Stat. Ann. § 14-3-402(a)(xii)(B); *see also In re CF*, 2005 WY 52, ¶ 15, 110 P.3d at 287–88.

[¶19] Viewing the State's evidence as true, disregarding any evidence that may conflict with this evidence, and giving the State every favorable inference that may fairly be drawn from this evidence, the record supports the juvenile court's finding Father neglected MC by providing care for her at a time he had methamphetamine in his system and transporting her in the standard car seat before she passed the car seat challenge. *See In re AE*, 2024 WY 28, ¶ 15, 544 P.3d at 1116 (quoting *In re NP*, 2017 WY 18, ¶ 12, 389 P.3d at 791). Therefore, the State proved by a preponderance of the evidence Father neglected MC when he failed or refused to provide adequate care necessary for her well-being. *See* Wyo. Stat. Ann. § 14-3-202(a)(vii).

## CONCLUSION

[¶20] The State presented sufficient evidence at the adjudicatory hearing to support the

5

district court's finding of neglect against Father.  Affirmed.